UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MAGNUM OIL TOOLS INTERNATIONAL, L.L.C., | § § § § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-00099 |
| | § | |
| TONY D. MCCLINTON, INDIVIDUALLY AND D/B/A "COWBOY TOOLS", *et al*, | § § § § | |
| Defendants. | § § | |

## ORDER

On April 5, 2013, the Court conducted a Markman hearing: a presentation to the Court on the issue of interpreting the claims of a patent. *Markman v. Westview Instruments, Inc*., 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384 (1996). After considering the materials offered and the arguments of counsel, as well as the parties' briefs, the Court issues the following Order construing the claims of the patents in question.

### I. Jurisdiction

This Court has subject-matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (patents).

### II. Factual and Procedural Background

Magnum Oil Tools International, L.L.C. (Magnum) sues as the owner of the patent rights represented by U.S. Patent No. 6,796,376 (the '376 Patent), entitled "Composite Bridge Plug System" (D.E. 1-1) and originally issued to Warren L. Frazier on September

28, 2004 as corrected on February 15, 2011 (D.E. 1-2). Magnum also sues as the owner of the patent rights represented by U.S. Patent No. 8,079,413 (the ''413 Patent), entitled "Bottom Set Downhole Plug" (D.E 1-3) and originally issued to W. Lynn Frazier on December 20, 2011. The Patents involve a bridge plug tool "for isolating and containing a well bore with reduced drill up time." D.E. 1-1; 1-2.

Magnum brought this action against Tony D. McClinton, Jaycar Energy Groups, L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motor Mills Snubbing, L.L.C., and Stan Keeling (Defendants) alleging, *inter alia*, that each has infringed claim four (4) of the '376 Patent and claims one (1) through twenty (20) of the '413 Patent. D.E. 1-4.

### III. Discussion

#### a. Patent Claim Construction

The Court construes the scope and meaning of disputed claim terms as a matter of law. *Markman,* 52 F.3d at 979. "[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman*, 517 U.S. at 372. The courts are to view claim construction as a form of the construction of a written instrument, in which the definition of claim terms is solely a question of law, over which judges are uniquely qualified to rule due to specialized training in legal analysis. *Id*. at 388-90. Claim construction orders are "solely a question of law subject to de novo review . . . including any allegedly fact-based questions relating to claim construction." *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998).

All claim terms in dispute must be defined as a matter of law by the court, no matter how common they appear.  "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  *02 Micro Internat'l Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Although "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims, when the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Id*. at 1362.  A claim construction hearing is held to determine the definition of all disputed terms.

In construing patent claims, the court looks first to the intrinsic evidence of record, meaning the patent itself, including the claims, specifications, and the prosecution history.  Such intrinsic evidence is the most significant and reliable source of the legally operative meaning of disputed claim language.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.  The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely."  *Id*. at 1583.

### i.  Intrinsic Evidence

Intrinsic evidence includes the words of the patent itself (including the claim language and specification) and the patent prosecution history where the court interprets

the meaning of all terms as the "ordinary and customary" meaning that "would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Id.* at 1582 (quoting *Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)). The meaning of a claim must also take into consideration the state of the art, language, and technology as of the patent application's filing date. *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005). The Federal Circuit has described the following hierarchy of review of intrinsic evidence:

> First, the court considers the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.
>
> Second, the court reviews the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.
>
> Third, the court may also consider the prosecution history of the patent, if in evidence.

*Vitronics*, 90 F.3d at 1582. "Claims must be read in view of the specification, of which they are a part. The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman, supra* at 979 (citations omitted).

Like the actual language of the patent, the specification and the prosecution history are created by the patentee in an attempt to explain and obtain the patent and the court uses these resources if the disputed term is not defined by the patentee or the ordinary and customary analysis. However, "because the [patent] prosecution history represents an ongoing negotiation between the [Patent and Trademark Office] and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

### ii. Extrinsic Evidence

A court should look to the extrinsic evidence only in order to clear up some genuine ambiguity in the claims. Extrinsic evidence "is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles;" "extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584. Because "extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence." *Phillips*, 415 F.3d at 1318.

### iii. Dictionary or Technical Treatise

Although dictionaries and technical treatises are extrinsic evidence, these resources can be used to determine the ordinary and customary meaning of a term during

analysis of intrinsic evidence or its context.  However, dictionaries and technical treatises should be used only so long as they do not contradict definitions found in or ascertained by a reading of the patent documents.  *Phillips*, 415 F.3d at 1318.  Such sources should be viewed as a starting point for an analysis carefully centered around and focused upon the intrinsic record.  *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316 (Fed. Cir. 2006).

    **B.**    **Analysis of Disputed Terms**

Pursuant to Rules of Practice for Patent Cases (P.R.) 4-3(a)(1), the parties have agreed upon the construction of a number of terms in the two patents, respectively, as set out in Exhibits A and B of their Joint Claim Construction and Prehearing Statement. D.E. 65, pp. 5-6.  The Court ADOPTS the construction of those terms as agreed by the parties.  Those terms and their constructions are set out in tabular form following this opinion.

The disputed terms are set out in Exhibits C, D, E, and F of the Joint Claim Construction and Prehearing Statement and in their respective briefs (D.E. 65, pp. 7-19; 70, 72), and will be addressed in turn below and set out in the tabular chart as Exhibit C following this opinion.

    **i. The '376 Patent**

With respect to the '376 Patent, the two disputed terms relate to the anti-rotation feature on the upwardly facing engaging portion and the head member.

### a. a mandrel having . . . an upwardly facing engaging portion in a set condition of the bridge plug for engaging a slot in a superposed bridge plug

Plaintiff claims that this term should be construed as stating: "After the plug is set in the wellbore, a cylindrical bar, spindle, or shaft that acts as a centralized support member having an upwardly facing portion that is capable of engaging a slot in a superposed bridge plug." D.E. 65, p. 7. The Defendants' construction is "The upper portion of the mandrel is shaped to fit within a slot in an upper bridge plug." D.E. 65, p. 17.

"Mandrel" has already been defined (see Exhibit A hereto), making the introductory language proposed by Plaintiff ("After the plug is set in the wellbore, a cylindrical bar, spindle, or shaft that acts as a centralized support member") unnecessary and potentially confusing. The crux of this dispute is in the meaning of "for engaging a slot." The Defendants' definition requiring a mandrel "to fit within" is an unnecessarily narrow reading of this term. *Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"). The alternate proposal of Plaintiff that the upper portion of the mandrel "can interlock with or cause to come into frictional driving contact with a slot in a superposed bridge plug" adds no clarity while potentially requiring additional extrinsic evidence regarding the terms "interlock" and "frictional driving contact" that is not required or justified.

The Court agrees with the Defendants' concern that a construction that the plug "is capable of engaging a slot" is too broad, as it connotes further modification of the

invention in order to achieve the functionality discussed. *See generally*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012); *Typhoon Touch Technologies, Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380-81 (Fed. Cir. 2011). The Court holds that the first disputed term is construed as "the upper portion of the mandrel engages a slot in a superposed bridge plug."

### b. a head member . . . having a slot for catchably retaining the engaging portion of a subjacent bridge plug

Plaintiff asserts that this second disputed term means, "A head member attached to the lower portion of the mandrel having a slot for holding or receiving an upper portion of a bridge plug located there below; the upper portion of the underlying bridge plug is capable of engaging the slot of the head member." D.E. 65, p. 8. In contrast, Defendants argue for the following language: "The head member has a slot that is designed to catch and retain the engaging portion of a lower bridge plug, thereby creating a torque transmitting connection." D.E. 65, p. 17.

The Defendants' reference to a "torque transmitting connection" is unnecessary as that term is already agreed upon. *See* Exhibit A, below. The primary focus of this dispute is on the concept of "catchably retaining," which Defendants argue needs no construction as it has a common-sense meaning. D.E. 72, p. 15 (citing *Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001)). Plaintiffs, however, argue for a construction involving the term "holding or receiving." The Court finds the substitute terms communicate no greater understanding

than the concept of "retention." The Court construes this term as "A head member having a slot that retains the engaging portion of a lower bridge plug."

### ii. The '413 Patent

#### a. first end and second end

Plaintiff proposes that these terms be construed as "at or adjacent to a first extremity" and "at or adjacent to a second extremity," suggesting that this construction requires no specialized knowledge and is consistent with ordinary and customary meaning. D.E. 65, p. 11; 70, p. 13. Defendants propose the constructions, "upper end" and "lower end." D.E. 65, p. 18. Plaintiff complains that "upper" and "lower" lose their significance in horizontal drilling.

The '413 Patents' parent application clarifies that "upper" and "lower" were used because they are terms to which field hands can relate:

> The words upper and lower are somewhat inaccurate because they refer to the position of the well tools as if they were in a vertical position while many, if not most, of the plugs disclosed herein will be used in horizontal wells. The words upper and lower are used for purposes of convenience rather than the more accurate, but odd to oil field hands, proximal and distal.

D.E. 72-4, pp. 3-4. Defendants' "upper" and "lower" construction is also consistent with the '413 Patent specifications:

- "The plug 200 can include a mandrel or body 210 having a first or upper end 207 and a second or lower end 208." '413 Patent at 5:24-26.

- "The terms "up" and "down"; "upward" and "downward"; "upper" and "lower"; "upwardly" and "downwardly"; "upstream" and

- "downstream"; "above" and "below"; and other like terms as used herein refer to relative positions to one another and are not intended to denote a particular spatial orientation since the tool and methods of using same can be equally effective in either horizontal or vertical wellbore uses." *Id*. at 7:57-64.

- A setting tool that is deployed from the surface "enters the body through the first end thereof." *Id*. at 13:64-65.

The Court agrees with the Defendants' construction, which is consistent with the usages of the terms in the '413 Patent and its parent application. "First end" means upper end and "second end" means lower end.

### b. the first and second ends of the body each comprise anti-rotation features formed thereon

Plaintiff construes this term to mean "An anti-rotation feature is formed on the first and second ends of the body." D.E. 70, p. 12. Defendants offer the following construction: "The anti-rotation features are formed on the first end of the body and the second end of the body. This phrase does not include anti-rotation features that are formed on another component of the plug." D.E. 65, p. 18. No specialized knowledge is required to construe this term and Defendants' proffered construction limits the placement of the anti-rotation feature contrary to the '413 Patent's specification that such a feature may be placed on other components "positioned about the body" of the plug. '413 Patent at 6:66-7:5. The Court adopts the Plaintiff's construction.

### c. "shearable threads" and "the insert comprises one or more shearable threads disposed on an inner surface thereof"

Plaintiff's construction of "shearable threads" is "spiral ridges that are designed to shear, fracture, break, or otherwise deform thereby releasing two or more engaged components, parts, or things." D.E. 65, p. 12. Likewise, the longer term is "the inner surface of the insert has one or more spiral ridges that can be broken, sheared, fractured, or otherwise deformed." *Id*.

Defendants' construction is that "shearable threads" means "threads that can be sheared, fractured, broken, or otherwise deformed when exposed to sufficient force." D.E. 65, p. 19. The corresponding longer term construction Defendants offer is: "the insert has one or more spiral ridges that wind around the inner surface of the insert. These threads can be sheared, fractured, broken, or otherwise deformed when exposed to sufficient force." *Id*.

The disagreement of the parties focuses on the Defendants' language placing the spiral ridges as "winding around" and the concept of such threads being sheared "when exposed to sufficient force." The former is offered as a common sense "clarification" of what a spiral ridge does. The court finds such clarification unnecessary.

The latter disagreement involves the nature of the force to be applied in order to shear the shearable threads. Plaintiff points out that the '413 Patent provides that the shearing takes place upon exposure to "a predetermined stress or force, releasing the component engaged within the body 102." 4:13-16. *See also* 3:4-7 ("The term 'shear' means to fracture, break, or otherwise deform thereby releasing two or more engaged

components, parts, or things or thereby partially or fully separating a single component into two or more components/pieces").

That "predetermined stress or force" can be used to release a "component engaged within the body" and "can be less than a stress and/or force required to fracture or break the body 102 of the insert 100, 100B" or "to break the plug body 210." 4:16-20; 9:25-28. Because the Defendants' construction fails to accommodate the '413 Patent's concept of a predetermined stress or force (capable of shearing the threads but not destroying other component parts), it is rejected and the Court adopts the Plaintiff's construction of both "shearable thread" terms.

## IV. Conclusion

For the reasons stated above, the Court interprets the claim language in the manner set forth above. For ease of reference, the Court's adoption of the parties' agreed claim terms is set forth in tabular form in Exhibits A and B and the Court's construction of disputed terms is set forth in Exhibit C.

ORDERED this 12th day of June, 2013.

_____
**NELVA GONZALES RAMOS**
**UNITED STATES DISTRICT JUDGE**

## EXHIBIT A

## CONSTRUCTION OF CLAIM TERMS, PHRASES, OR CLAUSES OF THE '376 PATENT ON WHICH THE PARTIES AGREE

| No. | Claim | Claim Term | Agreed Claim Construction |
|---|---|---|---|
| 1 | 4 | bridge plug | A plug that isolates one wellbore zone from another, including downhole tools with blind passages, plugged mandrels, as well as open passages extending completely therethrough and passages that are blocked with a check valve. |
| 2 | 4 | mandrel | A cylindrical bar, spindle, or shaft that acts as a centralized support member, around which outer components are positioned about or attached thereto. |
| 3 | 4 | head member | An outer component attached to the mandrel that causes other components between it and the upper collar to be compressed as the head member and the mandrel are pulled upwards during the setting process. |
| 4 | 4 | slot | An elongated groove, notch, slit, aperture, or other opening for receiving or admitting something. |
| 5 | 4 | a torque transmitting connection | A connection that transmits rotational force. |
| 6 | 4 | subjacent | Located under or below. |
| 7 | 4 | superposed | Located above or over. |

## EXHIBIT B

## CONSTRUCTION OF CLAIM TERMS, PHRASES, OR CLAUSES OF THE '413 PATENT ON WHICH THE PARTIES AGREE

| No. | Claims | Claim Term | Agreed Claim Construction |
|---|---|---|---|
| 1 | 1-20 | *body* | A centralized support member, made of one or more components or parts, for one or more outer components to be disposed thereon or thereabout. |
| 2 | 1-20 | *the insert has a passageway extending therethrough* | The insert has an opening that extends all the way through the insert and that permits fluid flow in one or both directions. |
| 3 | 1-20 | *a flow passage* | An opening that permits fluid flow in one or both directions. |
| 4 | 17-20 | *the first end of the body, the second end of the body, or both ends comprise an anti-rotation feature formed thereon* | An anti-rotation feature is present on one or both ends of the body. |
| 5 | 15 | *decomposable at a predetermined temperature, pressure, pH, or a combination thereof* | Subject to decomposing, degrading, degenerating, or otherwise falling apart at predetermined conditions that are likely to exist in a wellbore environment. |
| 6 | 1-20 | *axial force* | A force in the direction of the wellbore axis. |
| 7 | 1-20 | *the one or more shearable threads are adapted to deform to release the setting tool when exposed to a predetermined axial force, thereby providing a flow passage through the insert and the body* | An axial force that is known in advance deforms the shearable threads to release the connection with the setting tool. Once released, the absence of the setting tool provides a flow passage through the insert and the body. |

# EXHIBIT C

## COURT'S CONSTRUCTION OF CLAIM TERMS, PHRASES, OR CLAUSES OF THE '376 AND '413 PATENTS ON WHICH THE PARTIES DID NOT AGREE

| Claim | Disputed Language | Court's Construction |
|---|---|---|
| '376 Patent Claim 4 | a mandrel having . . . an upwardly facing engaging portion in a set condition of the bridge plug for engaging a slot in a superposed bridge plug | the upper portion of the mandrel engages a slot in a superposed bridge plug |
| '376 Patent Claim 4 | a head member . . . having a slot for catchably retaining the engaging portion of a subjacent bridge plug | a head member having a slot that retains the engaging portion of a lower bridge plug. |
| '413 Patent Claims 1-20 | first end | upper end |
| '413 Patent Claims 1-20 | second end | lower end |
| '413 Patent Claims 3,12 | the first and second ends of the body each comprise anti-rotation features formed thereon | an anti-rotation feature is formed on the first and second ends of the body |
| '413 Patent Claims 1, 7, 17 | shearable threads | spiral ridges that are designed to shear, fracture, break, or otherwise deform thereby releasing two or more engaged components, parts, or things |
| '413 Patent Claims 1, 7, 17 | the insert comprises one or more shearable threads disposed on an inner surface thereof | the inner surface of the insert has one or more spiral ridges that can be broken, sheared, fractured, or otherwise deformed |